No. 93-596

IN THE SUPREME COURT OF THE STATE OF MONTANA

1994

STANLEY GILMAN and JEANNETTE GILMAN,

      Plaintiffs and Appellants,

  -v-

STEPHEN R. BECK and CHARLENE BECK,

      Defendants and Respondents,

  and

STANLEY GILMAN,

      Plaintiff and Appellant

  -v-

STEPHEN BECK and MARTIN OLSEN,
insurance agent and real estate agent,

      Defendants and Respondents.

FILED

JUL 6 1994

Ed Smith
CLERK OF SUPREME COURT
STATE OF MONTANA

APPEAL FROM:    District Court of the Third Judicial District,
                 In and for the County of Powell,
                 The Honorable Mark P. Sullivan, Judge presiding.

COUNSEL OF RECORD:

      For Appellant:

          John L. McKeon, Anaconda, Montana

      For Respondent:

          Karl Knuchel, Livingston, Montana

                    Submitted on Briefs:  April 21, 1994

                              Decided:  July 6, 1994

Filed:

_____
              Clerk

Justice James C. Nelson delivered the Opinion of the Court.

This is an appeal from a Third Judicial District Court, Powell County bench trial finding for the defendant/respondent on the issue of the boundary dispute, and finding for the plaintiffs/appellants on the nuisance issue. We affirm.

The following are issues on appeal:

1. Did the District Court err by admitting hearsay evidence?

2. Were the District Court's findings of fact, conclusions of law and judgment based on substantial credible evidence?

3. Did the District Court err in not awarding damages to the Gilmans on the nuisance claim?

The Gilmans bought Lots 1 and 2 of the Larabie Addition in Deer Lodge in 1976. In 1984, Stephen and Charlene Beck bought Lots 3 and 4 in the Larabie Addition, making them the neighbors directly to the south of the Gilmans. Stephen Beck is presently the sole owner of the two lots. At some point after the two parties became neighbors, friction developed between the them which resulted in the present action.

The Gilmans filed a complaint against Beck on May 15, 1987. They then filed an amended complaint on July 1, 1987, contending that Beck was encroaching on the Gilmans' property, and praying that the item of encroachment, the garage, would be removed from the Gilmans' property and that Beck be assessed general and punitive damages. Moreover, on March 27, 1989, the Gilmans filed a complaint against the Becks, alleging that the Becks had constructed a wood burning stove in such a manner as to cause the

2

Gilmans' house to become smoke-filled and their air to be contaminated, thereby injuring the Gilmans' health and interfering with the comfort and enjoyment of their home. The two actions were consolidated on February 22, 1993. On July 13, 1993, this action was tried before the bench. Other facts will be presented as necessary for the resolution of the issues.

## 1. HEARSAY EVIDENCE

The Gilmans contend that the District Court erroneously admitted hearsay evidence and relied on the hearsay as the sole basis for the judgment. Beck asserts that the testimony provided at trial came from former neighbors and property owners of the lots in question and was not hearsay. Hearsay is defined at Rule 801(c), M.R. Evid., and provides:

> (c) Hearsay. Hearsay is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.

The document referred to as "hearsay" by the Gilmans is a lot sketch produced by Robert Burgess which was given to Beck as part of a package by the bank from which he obtained his loan to purchase his property. According to the lot sketch, the Beck garage lies entirely within the Beck property. When the document was offered by Beck's attorney, he stated that "[w]e'd move for the admission of Exhibit A illustrative as one of the documents that Mr. Beck received prior [to] buying his property." The document was not inadmissible hearsay, it was admitted purely as an illustrative exhibit. It portrayed Beck's _understanding_ of the lot lines.

3

Gilmans argue that the lot sketch provided the sole basis for the District Court to determine the boundary lines between the two properties. However, there was testimony provided by former owners of the lots as to the historical understanding of the boundary lines between the properties.

William Browne owned Lots 3 and 4 prior to Beck's purchase of the property. Browne testified that when he bought the property, he physically inspected the property with the former owner and he found a round circle stamped and branded onto the sidewalk with a line through it, marking the boundary between Lots 2 and 3. Browne testified that the mark was on the line "right between Lots 2 and 3." Browne further related that when he called a contractor to pour the foundation for his house, he showed the contractor the location of the mark. He also stated that when he built his garage, he built it on his own property. Finally, he testified that when the City dug up the sidewalk to provide water service for the Brownes, he marked the place where the original marker had been and when the new sidewalk was put in, he marked the area of the old marker onto the new sidewalk.

Juanita Browne also testified that when they decided to build the garage, the Springers, then owners of Lots 1 and 2, came out to see where the Brownes wanted to build the garage and they requested that the Brownes move the garage (to its present location) because they felt it was too close to their fence which they had constructed, with Browne's assistance, between Lots 2 and 3. Additionally, Juanita Browne was with William Browne when the

4

former owner, Mrs. Breeding, showed the marking on the sidewalk and stated, "I sold you this part, this land."

David Streufert, who purchased Lots 3 and 4 from the Brownes, testified that it was his understanding that the garden fence line on the Gilman property, north of the Beck garage, was the correct property line. He stated that they "maintained property along that line all the way over to where the sidewalk was." They were using an additional "three feet or so north of the garage. . . ."

Beck testified that the Gilman house was just to the north of his property line and that the northern section of Beck's garage was three feet from the property line as indicated by the lot sketch. He had been maintaining Lot 3 up to the chain link fence that Gilmans have for their garden. Beck also stated that he told Gilmans that he would maintain the sixty feet he felt he had purchased until it was proved otherwise.

The District Court considered evidence presented by a number of people in determining the location of the boundary lines between the two parcels of land. The lot sketch, which was not inadmissible because it was not hearsay, was just one piece of evidence used by the District Court to determine that the Gilmans did not carry their burden to prove that the lot lines were those established by the survey conducted by Hendricks, a surveyor hired by Gilmans to determine the proper boundaries of the lots in question.

## 2. SUFFICIENCY OF THE EVIDENCE

The Gilmans contend that the District Court's Findings of

5

Fact, Conclusions of Law, and Judgment was not based on substantial credible evidence. Beck asserts that the only evidence provided by the Gilmans to demonstrate that there was an encroachment on their property was the improper survey by Hendricks while Beck provided testimony from former owners as to the historical property lines.

> [W]e note that this case was decided by the trial judge sitting without a jury. The trial judge observed the demeanor of the witnesses and is in a better position to judge their credibility than a reviewing court, thus "[w]e will not substitute our judgment for that of the trier of fact, but rather will only consider whether substantial credible evidence supports the findings and conclusions" "Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses."

Emcasco Ins. Co. v. Waymire (1990), 242 Mont. 131, 135, 788 P.2d 1357, 1360. (Citations omitted.)

At trial, Gilmans offered the testimony of Donald Hendricks, a surveyor, who conducted a survey of the property involved in the action, and testified that "the south line of Lot 2 [passes] through the garage of Mr. Beck." He stated that Beck's garage encroaches about three feet onto Gilmans' property according to his survey. He also testified that Gilmans' garage encroached into Higgins Avenue and into the alley and all the lots in the area were "out of kilter," and about six and eitht tenths feet too far north.

However, Hendricks did not record the survey with the Powell County Clerk and Recorder's office as required by § 70-22-104, MCA. He also stated that he did not speak with any of the former owners of the properties at issue to determine whether they had any history which might assist in the survey. The District Court

6

allowed the admission of the survey as the surveyor's _opinion_ of the location of the lot lines.

On the other hand, Beck provided the testimony discussed above in Issue 1; former owners who stated that according to the historical boundaries of the lots, Beck's garage is entirely within his own property. Both of the Brownes testified that when they purchased Lots 3 and 4, the then current owner, Mrs. Breeding, showed them a sidewalk marker, marking the lot line for the property they were to purchase. According to that marker, Beck's garage would be entirely within his own property.

Juanita Browne also stated that when they decided to build the garage Beck currently owns, they invited their neighbors, the Springers, over to obtain their opinion about the location of the proposed garage. The Springers wanted the garage moved a little farther from the fence line, and the Brownes accommodated them, building the garage at its present location. David Streufert also testified and reported that it was his understanding that the Gilmans' garden fence line was the proper lot line for the property.

Beck offered a lot sketch which he received from the bank from which he obtained his loan to purchase his property. The lot sketch was provided to Beck from the bank, and was purported to represent the proper lot lines of the property. Beck testified that his garage was three feet from the lot line according to the lot sketch. He stated that he had been maintaining Lot 3 up to Gilmans' fence line.

We hold that there was substantial credible evidence upon which the District Court could base its Findings of Fact, Conclusions of Law, and Judgment, concluding that Beck's garage was built entirely on his own property and did not encroach onto Gilmans' property.

### 3. NUISANCE DAMAGES

Gilmans insist that the District Court erred in not assessing damages to the Gilmans for the nuisance created by Beck from the wood stove. Beck counters that Gilmans did not "produce any expert or other testimony to support any contentions that they were damaged in any way by the smoke from Mr. Beck's chimney." We agree with Beck.

Gilmans offered no testimony, expert or otherwise, to prove that they have suffered damages. The only evidence presented concerning monetary amounts was Stan Gilman's testimony that he would rent the upstairs apartment for $300 per month but he did not feel he could rent it because of the problem with smoke from Beck's wood stoves.

Although the Gilmans testified to medical problems associated with the smoke from the wood stoves, no expert medical testimony was presented nor were any medical bills or pertinent documents admitted by the Gilmans to prove damages to their health. "Plaintiffs have the burden of proving, by competent evidence, the amount of damages which they suffered. . ." Smith v. Zepp (1977), 173 Mont. 358, 370, 567 P.2d 923, 930. Here, the Gilmans have not offered any competent evidence to demonstrate that they have

8

suffered damages and the amount of damages suffered. The District Court did not err when it did not assess damages against Beck due to the smoke from his wood stoves.

Pursuant to Section I, Paragraph 3(c), Montana Supreme Court 1988 Internal Operating Rules, this decision shall not be cited as precedent and shall be published by its filing as a public document with the Clerk of this Court and by a report of its result to the West Publishing Company.

AFFIRMED.

_____
Justice

We Concur:

_____
Chief Justice

_____

_____

_____
Justices

9

July 6, 1994

CERTIFICATE OF SERVICE

I hereby certify that the following certified order was sent by United States mail, prepaid, to the following named:

John L. McKeon
Attorney at Law
124 Oak Street--P.O. Box 879
Anaconda, MT 59711

Karl Knuchel
Attorney at Law
P. O. Box 953
Livingston, MT 59047

ED SMITH
CLERK OF THE

SUPREME COURT

STATE OF

MONTANA

BY: *N. Gallagher*
Deputy